UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DAVID FROST,                                :
                              Plaintiff,    :
                                            :
        v.                                  :          **<u>OPINION AND ORDER</u>**
                                            :
LENTEX COMPANY, LLC, and                    :          20 CV 5313 (VB)
EMILY FALENCKI,                             :
                              Defendants.   :
-------------------------------------------------------------x

<u>Briccetti, J.</u>:

        Plaintiff David Frost brings this action alleging defendants failed to compensate him for

his work as a caretaker on defendants' estate.  He brings claims for failure to pay minimum and

overtime wages and unlawful retaliation under the Fair Labor Standards Act ("FLSA") and the

New York Labor Law ("NYLL"), failure to pay earned wages under the NYLL, as well as

breach of contract.

        Now pending is defendants' motion for summary judgment (Doc. #90), as well as

plaintiff's two motions to strike pursuant to Fed. R. Civ. P. 37.  (Docs. ##101, 111).

        For the reasons set forth below, the motion for summary judgment is GRANTED IN

PART and DENIED IN PART, and the motions to strike are DENIED WITHOUT PREJUDICE.

        This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

        The parties have submitted memoranda of law, declarations with exhibits, and statements

of undisputed material facts pursuant to Local Civil Rule 56.1, which together reflect the

following factual background.

1

I.    <u>Plaintiff's Relationship with Defendants</u>

Defendant Lentex Company, LLC ("Lentex"), a company owned by managing member, defendant Emily Falencki ("Falencki") and her stepmother, owns a 200-acre property, called Cascade Farm Estate, in Patterson, New York (the "Property").  (Doc. #93 ("Falencki Decl.") ¶ 2).  Falencki inherited her interest in Lentex from her grandmother, Karin Falencki, upon her death in December 2010.  (<u>Id</u>.).  Then, as now, Falencki lived in Nova Scotia.  (<u>Id</u>.).

From about 1987 until at least May 31, 2012, plaintiff was an at-will employee of the Falencki family or Lentex.  (Falencki Decl. ¶ 4).  The parties disagree about the scope of plaintiff's employment, but agree that during that period he was, at a minimum, employed as the caretaker of the Property.  (<u>Id</u>.; Doc. #52, First Amended Complaint ("FAC") ¶ 20).  From at least 2010 until May 31, 2012, plaintiff's compensation comprised:  (i) use of a "Caretaker House" and land on the Property without the payment of rent, (ii) an annual salary of $40,000, (iii) health insurance, and (iv) use of a Lentex-owned truck.  (Falencki Decl. ¶ 4; FAC ¶ 29).

II.   <u>Oral Agreement</u>

Plaintiff and Falencki agree that after Falencki's grandmother died, she and plaintiff entered into an oral agreement pertaining to the scope of plaintiff's future work for defendants (the "Oral Agreement"). However, they disagree about what was discussed and the terms of the ultimate agreement formed.

Falencki says that, in 2011, she "decided to terminate the employment of" plaintiff and another Lentex employee because she "no longer required their services and sought to avoid the cost of their salaries and healthcare."  (Falencki Decl. ¶ 5).  Ultimately, through conversations in 2011 and possibly into 2012, Falencki claims she and plaintiff agreed that Lentex would stop providing plaintiff health insurance at the end of 2011, plaintiff would cease being a Lentex

employee and earning a salary as of May 31, 2012, and plaintiff would be "permitted to stay in the Caretaker House rent-free, <u>as a tenant</u>, in exchange for performing limited caretaking duties" which constituted "a material reduction in the time and scope of the duties for which Frost was responsible when Karin was alive." (<u>Id</u>. ¶ 6).

On May 31, 2012, Falencki emailed her accountant Jeffrey Resnick:  "As of June 1st David Frost will no longer be on the payroll of Lentex.  He will continue to live there and work on the property in lieu of paying rent."  (Falencki Decl., Ex. E).  Resnick's colleague, Andrew Martin, replied, "Since David is no longer an employee but will be treated as an independent contractor the value of the rent is a non-taxable working condition fringe benefit to him . . . . Since he is no longer an employee you should not be required to maintain unemployment insurance."  (<u>Id</u>.).

Plaintiff's take on what he and Falencki agreed to is quite different.  He says they agreed he "would continue doing the work that I was doing for LENTEX, which included caretaking and farming full time, but that my compensation would have to be suspended temporarily awaiting resolution of the probate [of Karin Falencki's estate], that I would be made whole upon completion of the probate," and that "nothing really ever changed in terms of my responsibilities for the caretaking."  (Doc. #98 ("Wolnowski Decl."), Ex. 25 ("Frost Tr.")  at 123–24, 168).[1] Thus, according to plaintiff, he and Falencki agreed the terms and conditions of his employment would continue unchanged, except his health insurance would be temporarily suspended on December 31, 2011, his salary would be temporarily suspended on May 31, 2012, and after the probate process for Karin Falencki's estate concluded, his salary and insurance would resume

---

[1]     Citations to "Tr. at _" refer to the page number at the top right-hand corner of each transcript page.

and he would be paid retroactively for his suspended salary and any incurred out-of-pocket healthcare costs.  (FAC ¶ 30; Frost Tr. at 123, 169).

The parties also disagree about the meaning of certain emails they exchanged in 2012. They agree they exchanged draft lease agreements in July 2012.  (Falencki Decl. ¶ 7; Frost Tr. at 220).  But defendants focus on the fact that these documents did not provide for plaintiff's salary or benefits to be retroactively paid, and also on plaintiff's comment that he was "still looking at this as labor in lieu of rent" (Falencki Decl., Ex. A), whereas plaintiff claims he was solely referring to a component of the proposed draft leases, not his rights and obligations under the existing Oral Agreement.  (Doc. #100 ("Pl. Opp.") at 21).  Plaintiff's view is supported by one of the emails itself, which only refers to the drafts being exchanged and not to any preexisting arrangement.  (Falencki Decl., Ex. A).  For their part, defendants point to an email dated December 31, 2012, between plaintiff and another Lentex employee, in which plaintiff said he could not change the address for certain bills because he "was not an employee of Lentex."  (Id., Ex. B).  Plaintiff claims that what he meant by this was that he "was not a category of employee that was able to make that decision with New York State Electric and Gas.  They needed to have a management-level person do that. . . . I was an employee . . . but I was not the level of employee that they needed."  (Frost Tr. at 162).

III.    Work Post-Oral Agreement

Plaintiff and Falencki also dispute the scope of tasks plaintiff was expected to and did perform, the amount of time he dedicated to performing these tasks, and Falencki's degree of control over plaintiff's performance.

A.     Caretaking

Plaintiff testified he completed the following caretaking services for defendants:  lawn mowing (Frost Tr. at 97–98); pool maintenance each year through 2015, but not from 2016 onward (id. at 97–98, 194–97); snow removal (id. at 197–98); security rounds on the Property (id. at 97–98; 212–13); and being "on-call 24/7" to "answer some emergency or address some need of the Falencki family" (e.g., he assisted off-hours in 2018 when a tree branch fell through the roof of the main house).  (Id. at 124–25, 178–79).  Plaintiff acknowledged he was free to do whatever he wanted once he completed his duties for Lentex, including leaving the Property, even while "on-call."  (Id. at 180–81, 183).

Defendants argue plaintiff's description of his duties "exceed those that were to be performed under the Oral Agreement."  (Doc. #91 ("Pl. R. 56.1") at 10 n.5).

B.     Farming

The parties do not dispute that plaintiff spent a portion of his time farming on the Property and that, from 2012 through mid-2016, the Presbyterian Conference Association, Inc. ("PCA"), paid plaintiff in connection with a community supported agriculture ("CSA") farm it operated as part of a summer camp and retreat center in Holmes, New York, called the "Holmes Farm."  (Frost Tr. at 157–58; Doc. #95 ("Surgenor Decl.") ¶¶ 1, 3; Wolnowski Decl, Ex. 29 ("Frost Decl.") ¶ 3).  The Property and the Holmes Farm are a few miles apart.

But the parties do dispute the extent to which this farming work was on behalf of, or for the benefit of, PCA instead of Lentex.  Plaintiff testified "from 1997 through 2017 I farmed full time for the Falenckis, for LENTEX, in order to secure a very valuable agricultural tax benefit." (Frost Tr. at 94).  Plaintiff also testified he began working for PCA when Falencki's attorney, Jeffrey Rothschild, told him he "needed to preserve the ag tax benefit for Emily in early 2012."

5

(Id. at 88).  Plaintiff stated it took him about a year to "expand the operation . . . to use both the LENTEX property and the Holmes [Farm] property" to secure the tax benefit.  (Id.)  He maintains he farmed "for LENTEX at the time.  I had always farmed at LENTEX'[s] behest and would—and when I expanded the operation so that I could distribute the produce to Holmes [Farm], it was still farming for Emily's sake."  (Id. at 95).

Defendants proffer the declaration of PCA's executive director at the time, Peter Surgenor, which provides a rather different account.  Surgenor states the Holmes Farm grew crops on PCA's land and Lentex's land.  (Surgenor Decl. ¶ 6).  According to Surgenor, PCA "did not distinguish between its operations on the land owned by the PCA and Lentex," and at least some of the crops grown on Lentex's land were distributed to share members of PCA's CSA farm and used as food at PCA's camp.  (Id.).  Moreover, other PCA employees were involved in farming on Lentex-owned land, in the course of their employment for PCA.  (Id. ¶ 7). While Surgenor never explicitly discussed with plaintiff "who was employing [plaintiff] to farm the Lentex-owned property, the PCA did not intend to treat [plaintiff] any differently in this regard than its other Holmes Farm employees," and intended plaintiff's PCA compensation to cover "the growing of crops on the Lentex-owned property" as a service plaintiff performed for the Holmes Farm.  (Id.).  PCA did not compensate Lentex for use of the Property, but Surgenor understood Lentex permitted PCA to use its land for free because Lentex received a tax benefit.  (Id. ¶ 8).

    C.    <u>Falencki's Degree of Control over Plaintiff</u>

The parties agree that Falencki was plaintiff's primary contact at Lentex, but that Falencki, who lived in Nova Scotia, and plaintiff had little contact.  (Falencki Decl. ¶ 17; Frost Tr. at 190–91).

6

According to Falencki, their communications largely entailed plaintiff telling Falencki "what was going on at the property and requesting reimbursement for estate-related bills." (Falencki Decl. ¶ 17). Falencki claims she "did not actively supervise [plaintiff] or regularly review any of his work" (id.), but testified her "mother was there often and there were different members of the family" who frequently communicated with Falencki and informed her what plaintiff was or was not doing. (Falencki Tr. at 238–40).

Plaintiff acknowledges he had some level of autonomy in performing his duties and Falencki "trusted [him] to do the job and [he] did the job." (Frost Tr. at 191, 234). Nevertheless, the record shows Falencki made certain decisions related to the Property including, in April 2013, whether to engage a tree cleanup service and repair the lawnmower. (Falencki Tr. at 128–29). On February 4, 2019, she informed plaintiff there was a no hunting rule on the Property and she "would greatly appreciate if [plaintiff] would continue to enforce this rule." (Wolnowski Decl., Ex. 9).

IV.    Termination of the Relationship

Falencki testified she decided to terminate Lentex's arrangement with plaintiff in May 2019, because she felt he had stopped performing certain duties, including helping Lentex to maintain its agricultural tax exemption. (Falencki Decl. ¶ 19; id., Ex. G). On May 1, 2019, she sent plaintiff an email highlighting the many duties she believed plaintiff was failing to perform, directing him to remove his personal belongings "ASAP" from a barn and the surrounding area, and instructing him to either begin paying rent, purchase the Caretaker House, "[h]ave greater responsibility with regard to the upkeep of" the Property, or suggest an alternative idea for their relationship going forward. (Id., Ex. G).

Plaintiff responded with an email stating he had been a loyal employee for thirty-two years, and that Falencki's father and grandmother "assured me that I would always be taken care of by your family in return for my loyal service and dedication."  (Falencki Decl., Ex. G). Plaintiff also testified he believed Falencki intended only to terminate his living arrangements through her email, but "not necessarily the relationship with me as her employee."  (Frost Tr. at 219).  However, on May 9, 2019, Falencki sent another email stating that in light of plaintiff's email to her, she no longer wanted to offer plaintiff a continuing role serving the Property or her family, and plaintiff's only options were to buy, rent, or vacate the Caretaker House, a decision he would have to make by June 15, 2019, by contacting Lentex's lawyer.  (Falencki Decl., Ex. G).

Plaintiff made no overtures to buy or rent the Caretaker House by Falencki's deadline. (Falencki Decl. ¶ 20).  Nevertheless, plaintiff testified he "didn't stop working for Emily because I had not been told I was terminated until sometime in December 2020."  (Frost Tr. at 223). Regardless, plaintiff hired an attorney who, on July 24, 2019, wrote Falencki's counsel threatening to bring the instant claims against defendants.  (Falencki Decl. ¶ 21; id., Ex. H).  This was plaintiff's first complaint to Falencki that he did not receive wages allegedly due.  (Id. ¶ 21). The parties did not resolve the dispute, and plaintiff commenced this action on July 10, 2020. (Id. ¶ 22).

On December 30, 2020, Falencki sent a ninety-day notice to plaintiff directing him to vacate the Caretaker House and cease performing services for Lentex.  (Falencki Decl. ¶ 23; id., Ex. I).  Despite being told to leave, plaintiff continues to live on the Property.  (Id. ¶ 23).

**DISCUSSION**

I.    Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law .

. . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude

summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).[2]

A dispute about a material fact is genuine if there is sufficient evidence upon which a

reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir.

2010).  It is the moving party's burden to establish the absence of any genuine issue of material

fact.  Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element

of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex

Corp. v. Catrett, 477 U.S. at 322–23.  If the non-moving party submits "merely colorable"

evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at

249–50.  The non-moving party "must do more than simply show that there is some

---

[2]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004). Bald assertions, completely unsupported by admissible evidence, are not sufficient to overcome summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

II.   Plaintiff as "Employee"

Defendants argue they are entitled to summary judgment on plaintiff's FLSA and NYLL claims because plaintiff was not an "employee" of Lentex.

The Court disagrees.

A.   "Employee"

The FLSA's and the NYLL's minimum wage and overtime provisions only protect "employee[s]," not independent contractors. See, e.g., Saleem v. Corp. Transp. Grp., 854 F.3d 131, 139 (2d Cir. 2017); N.Y. Lab. Law § 651.

The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "[T]he determination of whether an employer-employee relationship exists for

purposes of the FLSA should be grounded in economic reality rather than technical concepts, determined by reference not to isolated factors, but rather upon the circumstances of the whole activity." Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008). Factors relevant to the economic reality test were established by the Supreme Court in United States v. Silk, 331 U.S. 704 (1947), and include:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

Brock v. Superior Care, Inc., 840 F.2d 1054, 1058–59 (2d Cir. 1988). However, the Second Circuit has "been clear that no single factor is dispositive and reiterated the necessary flexibility of the economic realities test." Agerbrink v. Model Serv. LLC, 787 F. App'x 22, 25 (2d Cir. 2019).

Under the NYLL, "employee" is defined as "any individual employed or permitted to work by an employer." N.Y. Lab. Law § 651. To determine whether a worker is considered an employee, courts consider the following factors: "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." Franze v. Bimbo Bakeries USA, Inc., 826 F. App'x 74, 79 (2d Cir. 2020) (summary order) (quoting Bynog v. Cipriani Grp., Inc., 1 N.Y.3d 193, 198 (2003)).

> Although these factors are similar to those considered under the FLSA inquiry, the focus [for NYLL] is slightly different: the critical inquiry in determining whether an employment relationship exists under the NYLL pertains to the degree of control exercised by the purported employer over the results produced or the means to achieve the results.

Id.

Nevertheless, "[t]here is general support for giving [the definition of 'employee' under both statutes] consistent interpretations and there appears to never have been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)." Ivanov v. Builderdone, Inc., 2021 WL 2554620, at *12 (S.D.N.Y. June 22, 2021).

      B.    <u>Application</u>

There are genuine factual disputes with respect to whether plaintiff was an employee of Lentex under the FLSA and the NYLL during the relevant period.

For summary judgment to be appropriate, defendants "must demonstrate that they neither formally nor functionally controlled Plaintiff[]—<u>i.e.</u>, that they were not employers under the formal control test <u>and</u> the functional control test." <u>Gil v. Pizzarotti, LLC</u>, 2021 WL 1178027, at *13 (S.D.N.Y. Mar. 29, 2021).

Here, there is conflicting evidence regarding plaintiff's level of autonomy in his role and Falencki's degree of oversight over him.  For example, plaintiff testified Falencki entrusted him to do his job, plaintiff did not have set working hours, and he was able to engage in outside employment.  However, plaintiff also identified examples of Falencki supervising or directing him, such as approving plaintiff's list of projects to undertake on the Property, determining whether repairs should be done, and requesting that plaintiff enforce the no hunting rule on the Property.  Plaintiff was also "on-call" to handle emergencies for the Falenckis.

Likewise, although plaintiff's salary and health benefits ceased in 2012, the parties each offer a conflicting account of whether this was due to plaintiff's termination of employment or whether plaintiff would, at some point, be made whole as to any missed payments or benefits.

Generally, the Court cannot credit the testimony of one witness over another, or determine the credibility of any witness, on summary judgment.  <u>Fincher v. Depository Tr. &</u>

Clearing Corp., 604 F.3d 712, 725–26 (2d Cir. 2010).  And, this is not an instance in which

plaintiff's testimony contradicts uncontroverted documentary evidence, such that it should be

deemed "self-serving" and disregarded.  See Deebs v. Alstom Transp., Inc., 346 F. App'x 654,

656 (2d Cir. 2009) (summary order) (party's self-serving testimony unsupported by admissible

evidence insufficient to defeat summary judgment).  Accordingly, there is a genuine factual

dispute as to whether Falencki had the power to control—and indeed did control—plaintiff.

Further, defendants claim that Lentex had "no business," and that its purpose is to own

and pay for the Property.  (Doc. #92 ("Def. Mem.") at 18).  In addition, Falencki testified

plaintiff "did not earn profits" from Lentex.  (Falencki Tr. at 194–95).  Accordingly, while

plaintiff did not share in profits or losses, it is not clear whether the business was a profitmaking

enterprise, or whether plaintiff could have invested in the business if he wished to.

There is also an issue of fact regarding whether plaintiff's position required a degree of

skill and independent initiative, making summary judgment inappropriate.  Plaintiff testified

defendants did not require him to have particular training or experience when they first hired

him.  Nevertheless, defendants rely on the independence afforded to plaintiff in executing his

duties, which he disputes.

Plaintiff worked for defendants in some capacity since at least 1987.  A service

relationship of over thirty years is of sufficient duration to support a finding that plaintiff was

Lentex's employee, particularly given that, for at least twenty-five years, the parties agree

plaintiff was in fact Lentex's employee.

Although defendants argue Lentex's sole purpose is owning and paying for the

Property—and therefore, that defendants had no "business" that plaintiff's work could be

integral to (Def. Mem. at 18)—there is a cognizable argument that plaintiff's caretaking duties

were crucial to Lentex owning the Property, potentially by maintaining the Property's agricultural tax benefit.  Thus, there is a question of fact regarding whether plaintiff's work was integral to defendant's business.

Accordingly, defendants are not entitled to summary judgment on plaintiff's FLSA or NYLL claims based on the assertion that plaintiff was not an employee of Lentex.

III.    Minimum Wage Claims

Defendants argue summary judgment is appropriate on plaintiff's minimum wage claims because plaintiff was paid more than the minimum wage for his services to Lentex.

Again, issues of fact preclude summary judgment.

The FLSA and the NYLL require employers to pay non-exempt employees at least a certain minimum hourly wage.  29 U.S.C. § 206(a); N.Y. Lab. Law § 652.

Under the FLSA, a "[w]age to any employee includes the reasonable cost . . . of furnishing such employee with board, lodging, or other facilities."  29 U.S.C. § 203(m).  The reasonable cost of housing under the FLSA is the lesser of (i) "the cost of operation and maintenance" of the house, or (ii) "the fair rental value" of the housing.  29 C.F.R. § 531.3(c).

 "Under both the FLSA and NYLL, once the Court determines the actual number of hours worked per week and calculates the regular rate based on these hours, the regular rate is then compared to the statutorily-imposed minimum wage to determine whether employees have been underpaid."  Java v. El Aguila Bar Rest. Corp., 2018 WL 1953186, at *10 (S.D.N.Y. Apr. 25, 2018).

As discussed above, Falencki testified the parties agreed plaintiff would only complete modified caretaking duties, while plaintiff testified they agreed he was employed to do caretaking and farming.  In light of this conflicting testimony, the Court cannot determine the

number of hours plaintiff worked within the proper scope of his potential employment without making a credibility determination, which would be improper at this stage.  And because ascertaining the number of hours plaintiff worked is necessary to determine whether his compensation met or exceeded the relevant minimum wage thresholds, summary judgment on plaintiff's minimum wage claims must be denied.

IV.    Overtime Claims

Defendants argue summary judgment is appropriate on plaintiff's claims for overtime wages because plaintiff is exempt from the FLSA overtime laws and, in any event, he did not work in excess of forty hours per week for Lentex.

The Court disagrees.

The FLSA and the NYLL each require employers to pay overtime compensation to non-exempt employees who work in excess of forty hours in a week.  29 U.S.C. § 207(a)(1); N.Y. Comp. Codes. R. & Regs. tit. 12, § 146-1.4.  "The requirement under both statutes is the same: Once an employee works 40 hours in a week, he must be paid 'one and one-half times his regular rate' for all excess hours."  Gamero v. Koodo Sushi Corp., 272 F. Supp. 3d 481, 499 (S.D.N.Y. 2018) (quoting Dejesus v. HF Mgmt. Servs., LLC, 726 F.3d 85, 88 (2d Cir. 2013)).

An employee is exempt from the overtime provision of the FLSA, however, if he "is employed in domestic service in a household and . . . resides in such household."  29 U.S.C. § 213(b)(21).  The FLSA includes "caretakers," i.e., those who provide "services of a household nature . . . in or about a private home,"  as individuals engaged in "domestic service employment."  29 C.F.R. § 552.3.

First, the Court cannot determine, as a matter of law, whether plaintiff is exempt from the FLSA overtime requirements.  Although the parties agree plaintiff lived on the Property and had

the title of "caretaker," there nevertheless is a genuine factual dispute as to whether plaintiff's role conforms to the FLSA exemption for "caretakers."  Here, to the extent plaintiff was an employee, he was employed by Lentex—not the Falencki family.  Moreover, his duties included caretaking land on the Property and allegedly farming on the Property.  Finally, he lived in a separate Caretaker House rather than the main residence.  See Rizzo v. DF Land LLC, 2014 WL 12560779, at *2 (S.D.N.Y. June 10, 2014) (genuine fact issue regarding whether plaintiff, an "Estate Manager" who lived in a separate house on employer's premises, qualified as a "domestic service worker").  These factual disputes make summary judgment on this ground inappropriate.

Also, as discussed above, there are factual disputes regarding how many hours plaintiff worked.  Therefore, it is impossible to determine, as a matter of law, that he did or did not work more than forty hours per week for Lentex.

Accordingly, summary judgment on plaintiff's overtime claims must be denied.

V.    Retaliation Claims

Defendants argue they are entitled to summary judgment on plaintiff's retaliation claims because plaintiff failed, as a matter of law, to demonstrate a causal connection between the filing of this lawsuit and an alleged adverse employment action.

The Court disagrees.

Under both the FLSA and the NYLL, it is illegal to retaliate against an employee for engaging in protected activity.  29 U.S.C. § 215(a)(3); N.Y. Lab. Law § 215(1)(a).  "Because the FLSA and NYLL retaliation provisions are nearly identical, claims under both statutes are analyzed using the same framework."  Perry v. High Level Dev. Contracting and Sec. LLC, 2022 WL 1018791, at *9 (E.D.N.Y. Mar. 16, 2022).

To establish a prima facie case of retaliation, a plaintiff must show "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." Mullins v. City of N.Y., 626 F.3d 47, 53 (2d Cir. 2010). Causation can be proven "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence." Natofsky v. City of N.Y., 921 F.3d 337, 353 (2d Cir. 2019).

Defendants do not dispute that plaintiff's filing of the complaint comprised protected activity or that his termination was an adverse action. However, they argue plaintiff cannot demonstrate a prima facie case of retaliation because he cannot prove a causal connection.

Based on the temporal proximity between plaintiff's filing of the instant lawsuit on July 10, 2020, and Falencki terminating his services and tenancy approximately five months later on December 30, 2020, the Court cannot conclude plaintiff has failed to show a causal connection between plaintiff engaging in protected activity and an adverse employment action as a matter of law.

The Second Circuit has "previously found the passage of up to six months between an adverse action and protected activity sufficient to permit an inference of causation." Specht v. City of N.Y., 15 F.4th 594, 605 (2d Cir. 2021) ("We hold that the [five month] time period between [the adverse action] and [plaintiff's] protected conduct is sufficient to permit an inference of causation."). Here, plaintiff began working for defendants in approximately 1987. He was a long-time employee of Lentex until at least May 2012 and continued to live on the Property and perform some services for Lentex through December 2020. Considered as a whole, the parties' long relationship, the contradictory testimony surrounding the Oral Agreement, and

the "reasonably close temporal proximity" between plaintiff's engaging in protected activity and experiencing an adverse employment action, the five-month gap here "is not prohibitively remote" to preclude an inference of causation.  See Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013) (finding prima facie case of retaliation where plaintiff filed a lawsuit seven months before she was terminated).

Defendants contend Falencki's emails "conclusively prove that Falencki decided as of May 9, 2019, that Frost should cease performing services and move out" (Def. Mem. at 23), and she only delayed implementing this decision until December 2020, because plaintiff's counsel threatened to bring this action.

The Court is not persuaded.  On May 1, 2019, Falencki emailed plaintiff and offered him three options, in addition to soliciting other suggestions from plaintiff:  "Start paying rent.  Buy the house and property where you currently live.  Have greater responsibility with regard to the upkeep of the Lentex property.  Other ideas welcome."  (Falencki Decl., Ex. G).  Plaintiff replied on May 6, 2019, explaining why his services were not deficient, and on May 9, 2019, Falencki responded, stating "your letter has led me to rethink my offer."  (Id.).  Falencki further wrote: "Let Jeff Rothschild know by June 15 if you would like to- Buy the Lentex property you live in. Rent the Lentex property you live in.  Leave the Lentex property you live in.  All further negotiations should be done through Jeff."  (Id.).  While these emails demonstrate Falencki decided to alter the parties' relationship, they leave the door open to "further negotiations," and Falencki does not "conclusively" terminate plaintiff's employment or state he should cease caretaking.  Moreover, plaintiff testified he continued to tend to the Property after these emails were received, of which Falencki was aware.  Because plaintiff has proffered sufficient evidence

of causation to state a prima facie case, the meaning and intention behind Falencki's emails is a question for the jury to resolve.

Accordingly, Court denies summary judgment on plaintiff's retaliation claims.

VI.   <u>Unpaid Wages Claim</u>

Defendants argue they are entitled to summary judgment on plaintiff's claim for unpaid wages under NYLL Section 191 because Section 191 does not apply to claims for non-payment of wages.

The Court agrees.

A.   <u>Standard</u>

NYLL Section 191 governs the "[f]requency of payments" and states, "[n]o employee shall be required as a condition of employment to accept wages at periods other than as provided in this section."  This provision governs certain type of workers.  A "[m]anual worker" is defined as "a mechanic, workingman or laborer."  N.Y. Lab. Law § 190(4).  Under Section 191(1)(a):

> A manual worker shall be paid weekly and not later than seven calendar days after the end of the week in which the wages are earned; provided however that a manual worker employed by an employer authorized by the commissioner pursuant to subparagraph (ii) of this paragraph or by a non-profitmaking organization shall be paid in accordance with the agreed terms of employment, but not less frequently than semi-monthly.

A "[c]lerical and other worker" includes all employees other than manual workers, railroad workers, and commission salesmen, "except any person employed in a bona fide executive, administrative, or professional capacity whose earnings are in excess of nine hundred dollars a week."  N.Y. Lab. Law § 190(7).  Pursuant to Section 191(1)(d), "[a] clerical and other worker shall be paid the wages earned in accordance with the agreed terms of employment, but not less frequently than semi-monthly, on regular pay days designated in advance by the employer."

In his opposition, but not his complaint, plaintiff raises a claim for unpaid wages under

NYLL Section 193, which states "[n]o employer shall make any deduction from the wages of an

employee" except as otherwise permitted in the statute.  Section 193 was amended in 2021 with

the "No Wage Theft Loophole Act" to clarify that "[t]here is no exception to liability under this

section for the unauthorized failure to pay wages, benefits or wage supplements."  2021 N.Y.

Laws ch. 397 § 1; N.Y. Lab. Law § 193(5).

      B.    <u>Application</u>

The Court agrees with defendants that NYLL Section 191 "by its terms only involves the

timeliness of wage payments, and does not appear to afford plaintiffs any substantive entitlement

to a <u>particular</u> wage."  <u>Myers v. Hertz Corp.</u>, 624 F.3d 537, 545 (2d Cir. 2010).  Although some

courts have held otherwise, the Second Circuit observed:

> New York courts have suggested that plaintiffs may not use Labor Law § 191 to seek
> unpaid wages to which they claim to be entitled under a statute; rather § 191 guarantees
> only that the wages the employer and employee have agreed upon be paid in a timely
> manner again according to the terms of [the employee's] employment.

<u>Id</u>. at 545 n.1; <u>see also</u> <u>Varn v. Orchestrade, Inc.</u>, 2020 WL 13558690, at *9 (E.D.N.Y. Mar. 30,

2020) (Section 191 "does not provide a cause of action for wages altogether withheld, as

opposed to wages not timely paid").  Accordingly, plaintiff's Section 191 claim for unpaid wages

fails as a matter of law because it provides no such right to relief.

In his opposition, plaintiff also claims entitlement to unpaid wages under NYLL Section

193, which was not pleaded in the complaint but still must be considered.[3]  However, plaintiff's

claim for unpaid wages accrued before Section 193 was amended to arguably provide a claim for

---

[3]    See <u>Albert v. Carovano</u>, 851 F.2d 561, 571 n. 3 (2d Cir.1988) (en banc) ("The failure in a
complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim.
Factual allegations alone are what matters.").

unpaid wages.  Thus, unless the amendment applies retroactively, plaintiff cannot save his claim by contending it arises under Section 193 instead of Section 191.

The Court concludes the amendment to Section 193 is not retroactive.  "Generally, retroactive operation of statutes is not favored by New York courts and it takes a clear expression of the legislative purpose to justify a retroactive application."  Gold v. N.Y. Life Ins. Co., 730 F.3d 137, 143 (2d Cir. 2013).  New York courts first look to the statutory text, and if that is unclear, they next look to legislative history.  Id.  Here, the statutory text is silent on the issue, while the legislative history states:

> The purpose of this remedial amendment is to clarify that: (a) the unauthorized failure to pay wages, benefits and wage supplements has always been encompassed by the prohibitions of section 193, see, e.g., Ryan v. Kellogg Partners Inst. Servs., 19 N.Y. 3d 1, 16 (2012) (correctly holding that employer's neglect to pay sum that constitutes a "wage" violated section 193).

2021 N.Y. Laws ch. 397 § 1.

The New York Court of Appeals has not addressed whether the No Wage Theft Loophole Act applies retroactively.  However, one New York appellate court considering a Section 193 claim for unpaid wages arising after the effectiveness of the No Wage Theft Loophole Act concluded a "wholesale withholding of payment and not a specific deduction from wages," which occurred before the amendment, was not a violation of Section 193.  Vergara v. Mission Cap. Advisors, LLC, 200 A.D.3d 484 (1st Dep't 2021); see Fersel v. Paramount Med. Servs., P.C., 2022 WL 14813738, at *4 (E.D.N.Y. Oct. 26, 2022) (denying motion for reconsideration on Section 193 claim for nonpayment of wages, which was premised on the adoption of the No Wage Theft Loophole Act); see also Cornejo v. Bell, 592 F.3d 121, 130 (2d Cir. 2010) (federal courts are "bound to apply the law as interpreted by New York's intermediate appellate courts

unless we find persuasive evidence that the New York Court of Appeals would reach a different conclusion").

In light of the Appellate Division's interpretation of state law, and the absence of any contrary state law, the Court declines to disturb controlling state court law and retroactively apply the No Wage Theft Loophole Act to plaintiff's Section 193 claim.  Accordingly, because plaintiff claims defendants failed to pay him all wages, he does not allege a specific impermissible deduction from wages sufficient for liability under Section 193.  Goldberg v. Jacquet, 667 F. App'x 313, 314 (2d Cir. 2016) (summary order) ("[T]o state a claim for a violation of NYLL § 193, a plaintiff must allege a specific deduction from wages and not merely a failure to pay wages.").

Defendants are therefore entitled to summary judgment on the NYLL unpaid wages claim.

VII.    Breach of Contract Claim

Defendants argue they are entitled to summary judgment on the breach of contract claim because it is time-barred and defendants did not breach the Oral Agreement.

The Court disagrees.

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages.  Fischer v. Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011).  "[A]n action upon a contractual obligation or liability, express or implied" must commence within six years of the claim accruing.  Ezra v. Weitz & Luxenberg, P.C., 794 F. App'x 27, 28 (2d Cir. 2019).  "Under New York law, a cause of action for breach of contract accrues . . . when the contract is breached."  Id. at 28–29.

Here, there are genuine issues of material fact regarding whether the contract was breached, and if it was breached, when it was breached.

Plaintiff and Falencki do not see eye to eye regarding the content and scope of the Oral Agreement. Plaintiff testified they agreed he would continue working as a caretaker and farmer on the Property, in exchange for living in the Caretaker House, his $40,000 salary, and health insurance, and that his salary and health insurance would be paid retroactively after Karin Falencki's probate was resolved. Falencki testified that, pursuant to the Oral Agreement, she terminated plaintiff's employment but allowed him to keep living in the Caretaker House rent-free in exchange for performing reduced caretaking duties.

Defendants attempt to introduce further evidence regarding Karin Falencki's probate process to prove that any purported breach of the Oral Agreement must have occurred more than six years prior to the commencement of this action, and thus, the statute of limitations has elapsed. The Court need not and does not consider this evidence—which is the subject of plaintiff's first motion to strike—because it would first need to determine the content and scope of the contract itself to conclude, as a matter of law, that the contract was breached and if so, when it was breached. Because there are questions of fact regarding whether the Oral Agreement obliged defendants to retroactively compensate plaintiff for his salary, healthcare expenses, and residence utilities, the Court cannot conclude as a matter of law either that the timing of the alleged breach renders plaintiff's claim time-barred, or that defendants did not breach the Oral Agreement.

Accordingly, summary judgment on the breach of contract claim must be denied.

VIII.    <u>Plaintiff's Motions to Strike</u>[4]

The documents subject to the motions to strike are not dispositive of, and were not considered by the Court in making, any finding or conclusion on defendants' motion.  Because no other motion currently before the Court requires the Court to consider these documents, the Court need not decide plaintiff's motions to strike and denies them without prejudice.  <u>See, e.g.</u>, <u>West v. NexPress Solutions, Inc.</u>, 2010 WL 1564014, at *1 (2d Cir. Apr. 20, 2010) (summary order) (denying motion to strike as moot where court declined to consider challenged document); <u>see also</u> <u>Watts v. City of Hartford</u>, 2004 WL 717132, at *2 (D. Conn. Mar. 31, 2004) ("[A] court may choose to deny a motion to strike and give the challenged materials whatever consideration may be appropriate in analyzing the motion for summary judgment.").

---

[4]    Plaintiff's motions seek to strike or otherwise preclude defendants from using, during motion practice or at trial:  (i) Stephen J. Krass as a witness, the Declaration of Stephen J. Krass in support of defendants' motion (Doc. #96), the probate documents regarding Karin Falencki's estate, which are attached as exhibits thereto (Docs. ##96-1–96-6, 97), and Exhibit H to the first Declaration of Emily Falencki (Doc. #93-6), which are property tax records.  (Doc. #101); and (ii) Exhibit A to the second Declaration of Emily Falencki (Doc. #108-1), which are a collection of property tax records submitted in support of defendants' reply.  (Doc. #111).

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED as to plaintiff's claim for failure to pay earned wages under the NYLL and DENIED as to all of plaintiff's other claims.

Plaintiff's motions to strike are DENIED WITHOUT PREJUDICE.

The Court will conduct a case management conference on **January 27, 2023, at 2:30 p.m.**, in Courtroom 620 at the White Plains courthouse.  The parties shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, as well as what good faith efforts they have made and will make to settle this case.

The Clerk is instructed to terminate the motions.  (Docs. ## 90, 101, 111).

Dated:  December 27, 2022
      White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge